IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No.   04-cv-00464-RPM

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

JUL 2 5 2005

GREGORY C. LANGHAM
CLERK

CITIZENS FOR PEACE IN SPACE,
WILLIAM SULZMAN,
MARY LYNN SHEETZ,
BARBARA HUBER,
GERARD JACOBITZ,
DONNA JOHNSON and
APRIL PERGL,

          Plaintiffs,

v.

THE CITY OF COLORADO SPRINGS,

          Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

The Defense Ministers of the nineteen nations who were then members of the North Atlantic Treaty Organization (NATO) met at the Broadmoor Hotel in Colorado Springs, Colorado, arriving on Tuesday, October 7, 2003, and departing on Friday, October 10, 2003.  Participants in that meeting included the Secretary General, Defense Ministers and delegations from each of the member countries, together with the Defense Ministers and delegates from seven invitee nations and from Russia and the European Union.  Spouses and supporting personnel for the delegations also attended.  A total of approximately 1,000 attendees occupied the entirety of the Broadmoor Hotel accommodations leased to NATO for this purpose.

1

The United States Secretary of Defense was the host for the meeting.

The security planning and operations were the responsibility of a U.S. Task Force working with the NATO International Staff.  Extensive advance planning was necessary.  Colonel Ulysses Middleton, a Security Forces Officer in the United States Air Force, was assigned as the security coordinator for the U.S. Task Force. In preparation for carrying out his assignment, Colonel Middleton observed a NATO meeting in Madrid, Spain, and participated in meetings in Washington, D.C., with the NATO Security Director and staff.  A security plan was developed for all foreseeable contingencies, including fire, natural disasters and terrorist attacks. Given the world history of bombings by the use of explosive laden automotive vehicles, emphasis was placed on establishing a limited access area or security zone around the hotel buildings and grounds.  That required closing of public streets leading into the Broadmoor area and the establishment of five checkpoints for all incoming vehicular and pedestrian traffic.  The plan for closure was implemented as shown on the map attached as Appendix A.  (Defendant's Exhibit A).

In April 2003, Lieutenant Colonel Robert Haughey and Senior Master Sergeant Michael Zirkle of the U.S.A.F. were assigned to the Security Task Force and Commander Steve Liebowitz together with Lieutenant Peter Carey of the City of Colorado Springs Police Department joined in the operational planning.  There was no disagreement by anyone involved in the planning process with the need for controlled access to the entire area of the Broadmoor, recognizing that the lethal air blast range for the explosives capacity of a small box van is 300 feet.

Wayne Hoskins, Security Director for the Broadmoor Hotel, met with the NATO security officials at the Broadmoor in December, 2002, to review the available accommodations and security measures required.  There were approximately 22 private residences within the limited access area.  The occupants of those residences were asked to cooperate and they expressed concern for their own safety at meetings held with the police officials and Mr. Hoskins.

The principal access to the Broadmoor from the highway is a four-lane street called Lake Avenue, running east and west.  Under the plan as implemented during the meeting, the primary checkpoint for ingress and egress was placed at the intersection of Lake Avenue and Second Street, one block east of the first Broadmoor buildings.  Vehicles entering the security zone at that location were directed to a parking area to the north of the intersection where they were searched thoroughly before being permitted to go back to that intersection and proceed west to their locations within the area.

A media center was established at the International Center (IC) located at the corner of Lake Avenue and Lake Circle which is within a direct line of sight to the main building of the Broadmoor.  The view was obstructed by landscaping that was in full foliage.  The Colorado Hall building, adjacent to the IC and abutting First Street, was the location for the logistical support for the media.  All interviews were held inside the IC.  Both local and international media representatives were given credentials and restricted to those two buildings.  Their movement beyond those buildings within the security area required escort from the security personnel

3

within that area consisting of Colorado Springs police officers, officers of the Mesa County Sheriff's Office, and Army and Air Force personnel.  These law enforcement and military personnel patrolled within the security zone.  Residents of the restricted area were permitted to have guests and other invitees to their homes. They were asked to minimize the number of people coming to their homes and to provide their names and times of arrival to the Broadmoor security office.

The media people were permitted to use their own vehicles which were searched upon every entry.  Those without vehicles were required to gather at the World Arena, an off-site location.  They were then bused in and out of the limited access area.  About 1,000 hotel employees were required to service the conference at the Broadmoor facilities.  They were given security background checks and required to wear badge identification.  They reported to an off-site location, the Penrose Equestrian Center, and were transported from there into and out of the limited access area by buses.

The vehicles bringing food, supplies and other materials from vendors to the hotel and private homes came through checkpoint one and were searched in the same manner as all other vehicles.  Mr. Hoskins' vehicle, like all others, was searched each time he came into the area.

William Sulzman and the other individual plaintiffs are members of Citizens for Peace in Space (CPIS) an organization that is a part of a global network advocating the demilitarization of outer space and the prevention of war. Mr. Sulzman was well known to the police in Colorado Springs as a peaceful

activist and a participant in demonstrations supporting that advocacy.  An annual

event called the Annual Space Symposium had been held at the Broadmoor Hotel

for several years.  The IC is the Convention Center for the hotel and it had been the

practice of CPIS to have Mr. Sulzman and other members gather at the sidewalk

area in front of the IC to display banners expressing the organization's views, to

distribute leaflets and to engage in dialog with attendees at the symposium.

Commander Liebowitz and other members of the Colorado Springs Police

Department were well aware of that practice and at no time had there been any

disruptions or incidents requiring police action.

On September 29, 2003, Mark Silverstein, Executive Director of the

American Civil Liberties Union of Colorado, discussed by telephone with

Commander Steve Liebowitz a request by CPIS to conduct a peaceful and orderly

protest during the NATO conference, standing with signs as had previously been

done at the space symposium meetings.  Commander Liebowitz explained that the

suggested location was within the security zone and would not be available to the

general public.  Commander Liebowitz suggested the Lake Avenue and Second

Street intersection in the vicinity of the first checkpoint as a suitable alternative

location.

Mr. Silverstein sent a written request to the city manager, chief of police and

the city attorney's office, dated October 1, 2003, asking to schedule a brief

demonstration for a specific time, such as four to five p.m. on Wednesday, October

8, at the public sidewalk outside the IC, where the CPIS members had been in the

5

past and limiting the size of the group to six persons with each participant willing to

submit to the same security checks as the members of the media.  The letter

included the names of the individual plaintiffs in this civil action.  That request was

denied by letter from attorney Laurie R. Miskel of the Office of the City Attorney of

Colorado Springs.  Ms. Miskel explained the legal position of the City that to grant

this request would require allowing other groups to protest or demonstrate from

within the security zone to avoid constitutional challenges and granting such access

would jeopardize the security of the restricted zone.

On Wednesday, October 7, 2003, the day before the NATO conference,

several groups gathered at locations along Lake Avenue to the east of checkpoint

one with signs and banners expressing various viewpoints while vehicles carrying

attendees at the NATO conference passed by on the way into the Broadmoor area.

Mr. Sulzman was one of those participating in the demonstrations.  The local

television news stations covered these demonstrations with photo coverage and

dialog.

On the opening day of the conference, Thursday, October 8, the six

individual plaintiffs in this case gathered across the street from checkpoint one with

a single banner.  Lieutenant Peter Carey met with the group and discussed a

request by Mr. Sulzman that they be permitted to go to the IC to stand and display

the banner in the manner described in Mr. Silverstein's letter.  When Lieutenant

Carey denied the request, Mr. Sulzman asked that the group be escorted to the IC

or that at least Lieutenant Carey tell the media and NATO attendees that the CPIS

group was available to them at the checkpoint.  Lieutenant Carey declined.

Reporters from Denver and Colorado Springs newspapers did talk with the CPIS group where they displayed their banner on the grassy area near the southeast corner of the intersection of Lake Avenue and Second Street, within sight of vehicles entering and leaving through checkpoint one.  The banner the plaintiffs displayed at that location was also displayed at the demonstrations on Lake Avenue on the previous day and had been included in the T.V. news coverage on that day.

In this lawsuit, the plaintiffs contend the City of Colorado Springs violated their rights protected by the First Amendment to the United States Constitution, made applicable by the Fourteenth Amendment, by refusing to grant their request for the very minimal opportunity to express their opposition to the military planning taking place at the NATO conference.

The government may impose reasonable restrictions on the time, place, and manner of public speech in a public forum, provided that the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant government interest, and that they leave open ample alternative channels for communication of the information."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).  The plaintiffs concede that the exclusion of them and the general public from the security zone was content neutral.  They acknowledge that the security of the conference was a proper governmental purpose.  The plaintiffs claim that the restriction imposed by the City

7

was not narrowly tailored and that the location provided near checkpoint one was not an adequate alternative channel of communication because it was away from the sight and hearing of the conference participants and the worldwide media covering the conference. The plaintiffs contend that the City was required by the First Amendment to allow them limited entry into the security zone for the purpose of staging a political demonstration.

What is at issue in this litigation is the legitimacy of a complete closure of a traditional public forum, the public streets within the security zone, to all persons other than accredited representatives of professional news organizations. The strength of the public purpose in this total exclusion must be measured by the interest to be protected. A regulation of speech satisfies the requirement of being narrowly tailored where it promotes "a significant government interest that would be achieved less effectively absent the regulation" and does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799. To meet this standard, a regulation does not need to be the least restrictive or least intrusive means available. *Id.* at 798. What is required is that "the means chosen are not substantially broader than necessary to achieve the government's interest." *Id.* at 800.

The safety of the people and property within the security zone is that interest. No specific and identifiable threat was known to the planners in advance of the conference, but the Colorado Springs police were aware that 450 pounds of ammonium nitrate mixed with fuel oil (ANFO) had been stolen from a mining

company in July 2003, and had not been recovered.  They were also aware that such material was the explosive mixture used in the destruction of the Murrah Federal Building in Oklahoma City and ANFO bombs had been used elsewhere in the world.

The City has suggested that it should not be held responsible for the plan because it was the work of NATO and the Department of Defense.  That is true but only the City had the authority to close its public streets.  That decision was justified by the unique circumstances presented by this conference.  The interests being served went beyond those of the United States.  The list of the nations represented by the attendees, attached as Appendix B, shows that there was a potential for tension because some of those nations had a history of conflict.  Some of the delegates brought their own armed security personnel.  That illustrates the concern that attendees felt for their safety.  The residents within the security zone had expressed their apprehension for their own safety during the conference, given the state of world affairs at the time of this meeting.

The balance of interests here involves more than weighing the request of the plaintiffs against the concerns of the security planners.  It is unlikely that this one limited incursion would have presented a logistical problem.  There were adequate personnel available to assure the peacefulness of a one-hour demonstration and the prevention of any disruption to the NATO conference.  The position taken by the City is that granting access to this small group would have opened the door to others.  That concern was valid.  While no other requests had been made as of the

9

late afternoon of October 8, it was reasonably probable that if the plaintiffs obtained the public notice they sought, similar requests would have been made by others on the following day.

The plaintiffs suggest that the City could have required permits for those seeking to demonstrate within the security zone, and that such a process would have allowed more speech, while still promoting the safety within the security zone.  Granting or denying requests for permits would have placed the police or other city representatives in the position of assessing the potential for danger or disruption of the requesting groups and their messages.  That would destroy the neutrality that is required by the First Amendment.

Under the circumstances of this case, the City's refusal to allow any demonstrators entry into the security zone was reasonable.  A clear rule avoids disputes about whether such a restriction is content neutral.  *See Hill v. Colorado,* 530 U.S. 703, 729 (2000) ("A bright-line prophylactic rule may be the best way to provide protection, and, at the same time, by offering clear guidance and avoiding subjectivity, to protect speech itself.")

Reviewing requests for permits to demonstrate within the security zone would have required the commitment of personnel and resources to screen them, to conduct background checks, to escort persons in and out of the area and to monitor their activities.

The restriction of demonstrators from the security zone left open adequate alternative channels for communication. The location at the intersection of Lake

10

Avenue and Second Street provided sufficient opportunity for the plaintiffs to communicate their message to the public directly and through the media.  The media representatives were not permitted to conduct interviews with delegates or others attendees outside of the IC.  The plaintiffs argue the Broadmoor Hotel was a "symbolic target" of their demonstration.  They have not shown that the difference between the permitted location and the street in front of the IC was a significant impediment to their freedom of expression.

Upon the foregoing findings and conclusions, it is

ORDERED, that judgment will enter for the defendant, dismissing the plaintiff's claims with costs to be taxed.

Dated: July 25 , 2005

BY THE COURT:

Richard P. Matsch, Senior District Judge